```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF INDIANA
                         HAMMOND DIVISION

ERIC GREENE                        )
                                   )
          Plaintiff,               )
                                   )
     v.                            )   Case No. 2:05-cv-83
                                   )
THE CITY OF HAMMOND, TRACY         )
BETUSTAK, Special Administrator)
of the Estate of JOSEPH A.         )
BETUSTAK, JR.,                     )
          Defendants.              )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary Judgment of the Defendant, The Estate of Joseph Betustak, and the Motion for Summary Judgment of the Defendant, the City of Hammond, filed on July 12, 2007 (DE 78, 80); the Motion to Exclude the Expert Testimony of Ron Scott filed by the defendants on July 12, 2007 (DE 75); the Motion to Strike Portions of Plaintiff's Exhibit "A" filed by the defendants on August 30, 2007 (DE 94); and the Motion for Leave to Amend Appendices A and B to Plaintiff's Response filed by the plaintiff, Eric Greene, on September 14, 2007 (DE 97). For the reasons set forth below, the Motion for Summary Judgment of the Defendant, The Estate of Joseph Betustak, and the Motion for Summary Judgment of the Defendant, the City of Hammond, filed on July 12, 2007 (DE 78, 80) are **GRANTED**. The plaintiff's claims arising under 42 U.S.C. §1983 are **DISMISSED**. The plaintiff's remaining claims are **DISMISSED WITHOUT PREJUDICE**. The Motion to Exclude the Expert Testimony of Ron Scott filed by the defendants on July 12, 2007 (DE 75), the Motion to Strike

Portions of Plaintiff's Exhibit "A" filed by the defendants on August 30, 2007 (DE 94), and the Motion for Leave to Amend Appendices A and B to Plaintiff's Response filed by the plaintiff, Eric Greene, on September 14, 2007 (DE 97), are **DENIED AS MOOT**.

## Background

The defendant, Officer Joseph Betustak, was assigned to investigate narcotics activity at a home on Wabash Street in Hammond, Indiana. (Deposition of Joseph Betustak, p. 5)[1] During this investigation, Betustak discovered cocaine, marijuana, and heroin in the trash outside the residence. (Betustak Dep. p. 5) In addition, Betustak was told by Jeffrey Randolph, who occasionally resided at the home and was the son of the homeowner, that the plaintiff, Eric Greene, kept crack cocaine at the residence and concealed it in the basement in children's clothing. (Betustak Dep. p. 6) Betustak also learned, based upon a prior arrest, that Greene carried a firearm. (Betustak Dep. p. 7)

In July 2004, Greene's girlfriend lived at the Wabash Street residence with their daughter. (Deposition of Eric Greene, p. 83) Though Greene had a Merrillville, Indiana apartment, he occasionally stayed at the Wabash Street home, and on the evening of July 15, 2004, he temporarily had moved some of his belongings to the house. (Greene Dep. p. 89) That evening, he spent time with his girlfriend and daughter and, at some time after 10:30 p.m., made

---

[1] Joseph Betustak Jr. died during the pendency of this matter and is represented by Tracy Betustak, as special administrator of his estate.

at least one trip from the residence to sell cocaine. (Greene Dep. p. 92) Greene further testified that on his return at around 11:30 p.m., both he and Randolph had cocaine. (Greene Dep. pp. 94-95)

    At approximately 5:00 a.m. the following morning, Betustak, working with Hammond Police Department members Sergeant Jose Burgos, Detective Chris Berdine, Corporal Jim Burk, Police Chief Brian Miller, and Lieutenant Ralph Bogie, executed a search warrant at the Wabash Street residence. (Deposition of Jose Burgos, pp. 6-8; Deposition of Brian Miller, p. 30; Deposition of Ralph Bogie, p. 4) During the execution of the warrant, Miller remained outside the residence, and Bogie remained upstairs inside the residence. The remaining officers, Betustak, Burgos, Berdine, and Burk, proceeded to the basement of the residence, which was illuminated by only the light of a television and the flashlights carried by the officers. (Betustak Dep. p. 9) In the basement, the four officers encountered Greene and Randolph, lying on separate beds and under covers. (Betustak Dep. p. 9) Betustak and Burgos covered Greene while Burdine and Burke attempted to subdue Randolph, who forcefully and vocally resisted the officers. (Burgos Dep. pp. 6-8)

    Greene testified that he was awakened by the officers' forced entry into the home and that, very quickly, the officers were on their way into the basement. (Greene Dep. p. 102) He testified that upon hearing the entry, he sat up in his bed and saw the officers running down the stairs. (Greene Dep. p. 103)

3

According to Greene, the officers did not announce that they were police and only yelled that he was to get his hands up. (Greene Dep. p. 102) He testified that three or four officers grabbed him and also stated that "two of them had the back of my shirt and the other ones had my arms." (Greene Dep. pp. 102-03) Greene was moved face down to the floor, but he could not recall if an officer held him there by placing his knee in his back. (Greene Dep. p. 107)

Greene testified that from his position on the floor he could see feet - "three of four, somewhere up in there" - and also that his hands were being held behind his back. (Greene Dep. p. 119) He stated that his hands were let go and then he heard the gunshot and felt its impact in his right finger, left wrist, and buttocks. (Greene Dep. pp. 119-20, 130) Greene saw the other officers struggling with Randolph, who "woke up screaming," but he could not say how many officers were attempting to restrain Randolph. (Greene Dep. p. 121) Greene further stated that after he heard the gunshot he "heard the cop or somebody say 'oh shit,'" and he jumped up and was thrown back down and cuffed. (Greene Dep. p. 124)

The events of this morning, as related by the officers, differ from Greene's in some respects. The officers stated that when they arrived in the basement Greene was still lying down under the covers.  They were uncertain if he was awake or asleep or whether he had access to a weapon. (Betustak Dep. p. 9) The officers claimed to have announced their presence and asked

4

Greene and Randolph to put their hands behind their backs. (Betustak Dep. p. 7) The officers further stated that only four officers entered the basement and only two - Betustak and Burgos - attended to Greene. (Burgos Dep. p. 7) Both Betustak and Burgos testified that Greene was not fully compliant and that he had been "flailing [his hands] back and forth like reaching towards the bed and then reaching back, putting his hands behind his back several times." (Betustak Dep. p. 12) Burgos testified similarly, stating that Greene was "fidgeting, shaking, moving," and that his "hands kept moving, I don't know why he kept moving them, but he'd move them." (Burgos Dep. p. 16)

Betustak began to holster his weapon in anticipation of cuffing Greene, when Burgos stated that he was closer and would do it. (Betustak Dep. p. 13; Burgos Dep. p. 18) Betustak then brought his weapon back to cover Burgos as he cuffed Greene when the gun went off. (Betustak Dep. p. 15) Betustak stated that the gun discharged accidentally and that he could not recall if his finger was on the gun's trigger when it went off. (Betustak Dep. pp. 14-15) He indicated that the weapon may have caught on his gear as he was moving it to cover Burgos. (Betustak Dep. p. 18) Miller, who was outside the residence at the time, stated that Betustak appeared "pale," "shaken," and "stunned" immediately after the incident. (Miller Dep., p. 31)

Betustak was subject to regular training through the Hammond Police Department. He testified that he was trained to keep his finger outside the trigger well of the weapon until ready to

5

shoot; that an officer should not attempt to cuff a suspect until the suspect was under control; and that during cuffing, one officer should maintain cover over the suspect, a method referred to by the parties as "contact and cover." (Deposition of Ron Scott, p. 101) Betustak underwent regular training: eight hours of firearms training each month, an annual firearms qualification, and two to three days of firearms training sessions annu-. ally.  (Miller Dep. pp. 19-21)

In his complaint, Greene sought recovery under six counts. In the first, he alleged a violation of unspecified constitutional rights against the City of Hammond and Betustak under 42 U.S.C. §1983. In Count II, Greene brought a second claim under §1983, alleging that Hammond maintained policies or customs exhibiting deliberate indifference to constitutional rights. Counts III and IV alleged state law claims of assault and battery and false arrest. Finally, Counts V and VI alleged excessive force and failure to instruct, train and supervise, but they made no reference to state or federal law.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." See **Celotex Corp. v. Catrett**, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); **Williams v. Excel Foundry & Machine, Inc**, 489 F.3d 309, 310 (7th Cir. 2007); **Treadwell v. Office of the Illinois Secre-**

6

*tary of State*, 455 F.3d 778, 781 (7th Cir. 2006); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004) 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Ballance v. City of Springfield, Illinois Police Department*, 424 F.3d 614, 616 (7th Cir. 2005); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990).  Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc*., 21 F.3d 146, 148 (7th Cir. 1994).  *See also* *Miller v. Borden, Inc*., 168 F.3d 308, 312 (7th Cir. 1999); *Plair v E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

See also *Scott v. Harris*, ___ U.S. ___, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."); *Celotex Corp.*, 477 U.S. at 322-323, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901; *Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).

The use of force during the course of an arrest, investigatory stop, or other seizure of a citizen is analyzed under the

Fourth Amendment. *Graham v. Conner*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). The Fourth Amendment imposes a standard of objective reasonableness. *Los Angeles County, California v. Rettele*, ___ U.S. ___, 127 S.Ct. 1989, 1992, 167 L.Ed.2d 974 (2007); *Campbell v. White*, 916 F.2d 421, 422 (7th Cir. 1990). Further, the measure of reasonableness is made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and pays "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1872.

However, the limits of the Fourth Amendment extend to the intentional conduct of state actors. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed 2d. 628 (1989) ("In sum, the Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct.") (citations and quotations omitted); *Campbell*, 916 F.2d at 423; *Frye v. Town of Akron*, 759 F.Supp. 1320, 1323 (N.D. Ind. 1991). In *Brower*, the Supreme Court expressly referred to the implication of the Fourth Amendment arising from a "governmental termination of freedom of movement *through means intentionally applied*." *Brower*, 489 U.S. at 597, 109 S.Ct. at 1381.

Betustak and the City of Hammond do not contend that Greene's actions reasonably prompted the intentional use of a firearm, and Greene does not concede that the gun discharged accidentally. Consequently, the initial dispute between the

9

parties regards whether the facts implicate the Fourth Amendment at all. Greene, however, makes little more than passing reference to Betustak's intentional use of his weapon. In response to the defendants' motions for summary judgment, in which the defendants assumed the accidental nature of the weapon's discharge, Greene responded that the defendants cited to nothing in the record to indicate this agreement. (Response, p. 15) The inference that Greene disagrees that the shooting was accidental is made clear when he refers to Betustak's conduct as "negligent, reckless, willful and wanton, and intentional" (Resp. p. 5) However, Greene also bases his arguments on the belief that "whether it was accidental or not is of no consequence in an excessive force case." (Resp. p 15)

     Greene offers no evidence that Betustak intentionally fired his weapon. His citation to the record that follows the characterization of Betustak's state of mind as, among others, willful and intentional, leads to his own Statement of Genuine Issues, which largely recites facts that agree with the defendants' version of the facts[2]. More importantly, the instances when the facts are not in agreement, such as the dispute regarding Greene's compliance with the officers' orders, are not relevant to Betustak's state of mind. Clearly, had Betustak claimed that

---

[2] In this regard, Greene's Statement of Genuine Issues fails to comply with Local Rule 56.1, which requires that this statement contain "all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Instead, Greene has presented a series of uncontested factual allegations, opinion, and legal conclusions. The court has attempted to extract those issues over which the parties have a genuine, relevant dispute.

10

he intentionally fired in response to an objectively reasonable threat posed by Greene, these would be material facts. They would characterize the threat, if any, posed by Greene. This dispute also might be relevant to a claim that Betustak was negligent in keeping his gun unholstered despite Greene's total compliance. That is not the case presented by these circumstances. Under Rule 56, Greene must provide some evidence to support the claim that Betustak intentionally fired his gun. He has not. *Roger*, 21 F.3d at 148 ("However, in cases in which the nonmoving party bears the burden of proof on a dispositive issue, that party also bears the burden of affirmatively demonstrating a genuine issue for trial on that issue."). *See e.g.* **Pollino v. City of Philadelphia**, No. Civ.A. 03-6288, 2005 WL 372105 at *7 (E.D. Pa. Feb. 15, 2005) (concluding that unsworn statements regarding officer's claimed accidental shooting were insufficient to prevent entry of summary judgment on Fourth Amendment excessive force claim).

Instead, Greene's citations point to statements that suggest Betustak was at fault because he pointed his weapon at Greene and because he placed his finger in the trigger well. (*See* Statement of Genuine Issues, ¶¶ 25-33) Greene further cites to Betustak's subsequent reprimand for the "negligent discharge" of his weapon and Greene's own expert's characterization of Betustak as "grossly negligent." In contrast to claims arising under the Due Process Clause, a theory that is not applicable here, unintended conduct does not trigger a Fourth Amendment violation. **Campbell**, 916 F.2d 423. *See also* **Frye**, 759 F.Supp. at 1323; **Troublefield v.**

11

*City of Harrisburg Bureau of Police*, 789 F.Supp. 160, 162-166 (M.D. Pa. 1992); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990); *Glasco v. Ballard*, 768 F.Supp. 176, 180 (E.D. Va. 1991)("[A] more appropriate understanding of the case law, as well as the history of the Fourth Amendment, suggest that a wholly accidental shooting is not a 'seizure' within the meaning of the Fourth Amendment."); *Pollino*, 2005 WL 372105 at *7.

In his response, Greene draws a brief analogy to *Patterson v. Fuller*, 654 F.Supp. 418 (N.D. Ga. 1987), summarily arguing that this case supports a claim founded on the Fourteenth Amendment. Greene provides no other argument that implicates the Fourteenth Amendment and does not address the Supreme Court's conclusion, subsequent to *Patterson*, that "all claims that law enforcement officers used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871; *Estate of Phillips*, 123 F.3d at 592.

Greene further relies on *Patterson* for the argument that negligent conduct may violate the Fourth Amendment. Again, subsequent decisions by the Supreme Court cast considerable doubt on this conclusion. *See* *Brower*, 489 U.S. at 596, 109 S.Ct. at 1381. *See also* *Andrade v. City of Burlingame*, 847 F.Supp. 760, 765 (N.D. Cal. 1994).

While the discharge of the firearm was not the "means intentionally applied" to seize Greene, there is no doubt that

12

Greene was seized by means that included the officers' verbal commands, physically placing Greene on the floor, and training their weapon on him. There is no indication that this conduct separately caused any of the damages for which Greene seeks recovery. Even assuming his complaint seeks damages arising solely from this conduct, there is no indication that Betustak's intentional conduct was unreasonable.

This situation is distinct from the circumstances in **Armstrong v. Furge**, in which the police officers held the barrel of a gun within inches of an unarmed suspects head for several minutes. Greene fails to recognize the broader context and reasoning in **Armstrong**:

> The officers had a search warrant for the apartment to look for cocaine and items related to drug distribution, including firearms. When they broke through the door to execute their search warrant, they did not know who would be in the apartment. They saw the Plaintiff immediately inside and ordered her to get on the ground. It was not unreasonable for them to have had their guns drawn as they entered so that they could be prepared for whatever was on the other side of the door. Also, taking into account the tense and rapidly evolving circumstances that can exist when carrying out search warrants for drugs and firearms, it was not unreasonable to keep the gun on the Plaintiff until the apartment could be secured.
>
> **Armstrong v. Furge**, No. 1:05-CV-378, 2007 WL 496381 at *5 (N.D. Ind. Feb. 12, 2007)

Similarly, in this instance, the officers arrived to serve a narcotics related search warrant in a darkened basement on an individual known to carry a weapon. In the brief period of time

13

in which these events occurred, no officer had secured the remainder of the basement, and there is no dispute that throughout the events with Greene, officers Burk and Berdine struggled with a highly out of control suspect. In addition, it was not certain whether Greene or Randolph were armed. No reasonable jury could conclude that Betustak was objectively unreasonable when he drew his weapon under these circumstances.

The conclusion that no constitutional violation occurred disposes of Greene's claims against Betustak individually and his claims against the City of Hammond. **Windle v. City of Marion, Indiana**, 321 F.3d 658, 663 (7th Cir. 2003); **Estate of Phillips**, 123 F.3d at 596-97 ("Having decided that the officers did not violate the Constitution, we must conclude that neither the City nor Police Chief Arreola can be held liable for Mr. Phillip's death."). The absence of a constitutional violation also renders it unnecessary to consider Betustak's entitlement to qualified immunity. **Estate of Phillips**, 123 F.3d at 597.

Because the court's conclusion is reached even when considering at least portions of Greene's contested expert testimony, the motion regarding the admissibility of this evidence is **DENIED AS MOOT**. Finally, having disposed of the plaintiff's federal claims, the court will dismiss without prejudice Greene's state law claims. **Pugel v. Board of Trustees of University of Illinois**, 378 F.3d 659, 669 (7th Cir. 2004) (quoting **Wright v. Associated Insurance Companies, Inc.**, 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he general rule is that, when all federal claims are

14

dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolv[e] them on the merits."). See also **Easley v. Kirmsee**, 235 F.Supp.2d 945, 965 (E.D. Wis. 2002).

_____

For the foregoing reasons, the Motion for Summary Judgment of the Defendant, The Estate of Joseph Betustak, and the Motion for Summary Judgment of the Defendant, the City of Hammond, filed on July 12, 2007 (DE 78, 80), are **GRANTED**. The plaintiff's claims arising under 42 U.S.C. §1983 are **DISMISSED**. The plaintiff's remaining claims are **DISMISSED WITHOUT PREJUDICE**. The Motion to Exclude the Expert Testimony of Ron Scott filed by the defendants on July 12, 2007 (DE 75), the Motion to Strike Portions of Plaintiff's Exhibit "A" filed by the defendants on August 30, 2007 (DE 94), and the Motion for Leave to Amend Appendices A and B to Plaintiff's Response filed by the plaintiff, Eric Greene, on September 14, 2007 (DE 97), are **DENIED AS MOOT**.

ENTERED this 6th day of November, 2007

                                              s/ ANDREW P. RODOVICH
                                                   United States Magistrate Judge